UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
FERMIN LOPEZ, et al.,

      Plaintiffs,

  -against-            14-cv-1274 (LAK)

NIGHTS OF CABIRIA, LLC, etc., et al.,

      Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

> Michael Antonio Faillace
> MICHAEL FAILLACE & ASSOCIATES, P.C.
> *Attorney for Plaintiffs*
>
> Alexander Wilde Leonard
> Carolyn Diane Richmond
> FOX ROTHSCHILD, LLP (NYC)
> *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

    The three named plaintiffs in this case – Fermin Lopez, Cesar Melo, and Armando Ajtun – were employed as tipped delivery workers[1] at defendants' restaurant, which operated as "Two Boots Pizza," in the East Village.[2] Notwithstanding their designation as tipped delivery workers,

---

[1] Compl. [DI 2] ¶ 39.

[2] *Id.* ¶ 30. Plaintiffs Lopez, Melo, and Ajtun allegedly worked at Two Boots Pizza for approximately eight months, three months, and twelve months, respectively, between 2012 and 2014. *Id.* ¶¶ 42, 67, 88.

2

plaintiffs allege that they spent a "considerable part of their work day" performing non-tipped, non-delivery duties without due compensation.[3] They bring this suit to enforce their alleged rights under the Fair Labor Standards Act ("FLSA")[4] and the New York Labor Law ("NYLL").[5] Plaintiffs claim principally that defendants failed to pay their requisite minimum and overtime wages, that they did not receive "spread of hours" pay as required by the NYLL,[6] and that they were compensated improperly at the "tip credit" rate in light of their allegedly substantial non-tipped duties.[7] The suit

---

[3] *Id.* ¶ 4 (plaintiffs' non-tipped, non-delivery duties allegedly included "preparing salads, sweeping and mopping the basement and the area around the counter, scraping parmesan cheese, bringing up food and any other items needed by the kitchen staff, taking out the garbage, cleaning the basement after stocking every delivery, cleaning the bathrooms, windows and the sidewalk, bringing up sodas and placing them in the refrigerator, ripping apart cardboard boxes and tying them up, carrying down and stocking deliveries in the basement, washing pizza trays and placing them on the car for use the next day, bringing in and taking out the bicycles, cleaning tables and sweeping and mopping the entire place after closing, washing bathrooms at night and in the morning, bringing down the security doors after closing and going shopping to a Chinese store on Houston Street").

[4] *See id.* ¶¶ 135-45 (alleging claims under 29 U.S.C. § 201 *et seq.*).

[5] *See id.* ¶¶ 146-50 (alleging failure to pay minimum wages under NYLL §§ 652(1), 663), 151-55 (alleging failure to pay overtime wages under NYLL §§ 190 *et seq.*, 663), 156-59 (alleging failure to pay spread of hours pay under NYLL §§ 190 *et seq.*, 650 *et seq.*, and 12 N.Y.C.R.R. §§ 142–2.4(a)), 160-62 (alleging failure to comply with record-keeping requirements under NYLL § 195(1)), 163-65 (alleging failure to provide wage statements under NYLL § 195(3)).

[6] "New York law provides that covered employees . . . are entitled to an additional hour's pay at the basic minimum hourly wage rate for any day in which 'the spread of hours' – defined as 'the interval between the beginning and end of an employee's workday' – exceeds 10 hours." *Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 339 (S.D.N.Y. 2005) (quoting 12 N.Y.C.R.R. § 142-2.18) (internal citation omitted).

[7] DI 2 ¶ 8 (citing 12 N.Y.C.R.R. § 146).

3

purports to be a collective action under the FLSA and a class action under state law,[8] although no request for class certification or collective action status has been made. The matter is now before the Court on the parties' joint request for approval of a proposed settlement.[9]

*The Proposed Settlement*

The proposed settlement agreement (the "Agreement") would discontinue the case in exchange for a payment of $27,500.[10] Plaintiffs' counsel would retain either $11,000 or $12,000 as its fee, the precise amount being unclear because counsel's submission refers to two different fee amounts on successive pages.[11] Whichever figure is correct, counsel's proposed fee is between 40 and 43.6 percent of the total settlement payment. Of the remaining settlement funds, $2,000 would "be paid directly to the Plaintiffs as wages, while the remainder of the settlement amount will be paid by check to Plaintiffs' attorneys," who would then "distribute $14,500 of that additional amount to the Plaintiffs themselves."[12]

Plaintiff's counsel estimates that if plaintiffs had proceeded to trial, their maximum

---

[8] *See* DI 2 ¶ 12 (stating that plaintiffs bring suit under both the FLSA and the Labor Law "on behalf of themselves, and other similarly situated individuals.").

[9] Ltr. from J. Androphy to Court (Oct. 2, 2014) ("Androphy Ltr.").

[10] *Id.* at 2.

[11] *Compare id.* at 2 ("Under the settlement, Defendants will pay $27,500 to settle all claims. Of the settlement amount, $16,500 will go to the Plaintiffs themselves, with $11,000 to go to Plaintiffs' attorneys."), *with id.* at 3 ("Under the settlement, and in accordance with their retainer agreements with the Plaintiffs, Plaintiffs' counsel receives $12,000 from the settlement fund as attorneys' fees and costs.").

[12] *Id.* at 2.

recovery would have been $49,000, "including liquidated damages, and not including a potential attorneys' fees award," and that "[a]pproximately $12,000 of that sum represents unpaid minimum and overtime wages."[13]  Plaintiffs therefore stand to receive $16,500 from the proposed settlement, or approximately 33.7 percent of their alleged $49,000 maximum recovery.

The parties assert that the Agreement is "fair, reasonable, adequate, and in the Parties' mutual best interests."[14]  The Court is told that "there were sharply contested factual and legal disputes," including "a dispute over whether or not the Defendants were allowed to pay Plaintiffs at a lower tip-credit rate" and "disputes over the number of hours Plaintiffs worked each week, and the duration of their employment."[15]  Defendants claim that, under *their* calculations, plaintiffs are entitled to no more than $8,000 in wage and overtime payments and no more than $25,000 in total damages.[16]  These estimates differ from plaintiffs' calculations by $4,000 and $24,000, respectively. The parties state that the proposed settlement emerged from "arduous arms-length bargaining"[17] and vigorous contestation of various factual disputes.

For reasons that will appear, several specific provisions of the Agreement are relevant to the Court's decision whether to approve it**.**

First, the Agreement contains a number of confidentiality provisions.  One would bar

---

[13]   *Id*. at 2.

[14]   *Id.* at 1.

[15]   *Id.* at 2.

[16]   *Id.* at 2-3.

[17]   *Id.* at 1.

the plaintiffs from discussing the settlement with anyone except their "immediate family members, financial advisors and attorneys."[18] Another provision – a gag order, really – states that plaintiffs "shall not directly or indirectly encourage, solicit, or support third party, person or entity . . . with respect to any litigation, arbitration, and/or civil action in which Defendants could be implicated or discussed in any way, unless pursuant to subpoena or other compulsory legal process."[19] A similar provision states that plaintiffs and defendants have agreed that, if asked about the status of the pending action or the Agreement, they are to respond "solely by stating that 'The Parties' dispute has been amicably resolved.'"[20] The Agreement additionally contains a non-disparagement clause, stating that plaintiffs "will not make any negative statement about the Defendants, or otherwise disparage them, nor will they encourage or direct others to do so."[21]

To enforce these confidentiality terms, the Agreement contains a liquidated damages provision. Under this section, defendants can seek "specific performance and injunctive or other equitable relief" for violations of the Agreement's confidentiality and non-disparagement obligations.[22] Further, in the event of a "judicial determination" that plaintiffs have violated those obligations, plaintiffs are to pay liquidated damages in the amount of $3,000, plus defendants'

---

[18] Agreement § 8(A).

[19] *Id.* § 8(B).

[20] *Id.* § 8(E).

[21] *Id.* § 8(C).

[22] *Id.* § 8(D).

6

attorneys' fees.[23]

Second, the Agreement contains a series of broad releases. In exchange for the $16,500 settlement payment, the named plaintiffs, under the proposed Agreement, would waive all claims "of any kind whatsoever, at law or in equity, direct or indirect, known or unknown, discovered or undiscovered, which they had, now have or hereafter can, shall or may have against Defendants."[24] The waiver would encompass all matters "from the beginning of the world to the effective date of this Agreement."[25] Moreover, instead of covering only wage-and-hour claims or matters relating to the instant suit, the releases would cover:

> "any other claim, whether for monies owed, reimbursement, attorneys' fees, litigation costs, damages, torts, intentional infliction of emotional distress, negligence, promissory estoppel, breach of contract, breach of an implied covenant of good faith and fair dealing, constructive discharge, wrongful discharge, defamation, fraud, misrepresentation, or otherwise, arising prior to or at the time of the execution of the Agreement."[26]

*Discussion*

I.   *The Legal Standards Governing Proposed FLSA Settlements*

The FLSA places "strict limits on an employee's ability to waive claims for unpaid wages or overtime under 29 U.S.C. § 216 for fear that employers would coerce employees into

---

[23]   *Id.*

[24]   *Id.* § 5.

[25]   *Id.*

[26]   *Id.*

7

settlement and waiver."[27] The Supreme Court, however, has indicated "that employees may waive FLSA claims pursuant to judicially-supervised settlements."[28]

Some disagreement has arisen among district courts in this circuit as to whether such settlements do in fact require court approval, or may be consummated as a matter of right under Rule 41.[29] The trend among district courts is nonetheless to continue subjecting FLSA settlements to judicial scrutiny.[30] This Court sees no reason at present to deviate from the traditional practice, particularly as the parties have "have requested judicial approval" in this case.[31]

District courts must evaluate whether a proposed FLSA settlement is "fair and

---

[27] *Manning v. New York Univ.*, No. 98-cv-3300 (NRB), 2001 WL 963982, at *11 (S.D.N.Y. Aug. 22, 2001), *aff'd on other grounds*, 299 F.3d 156 (2d Cir. 2002).

[28] *Elliott v. Allstate Investigations, Inc.*, No. 07-cv-6078 (DLC), 2008 WL 728648, at *1 (Mar. 19, 2008) (discussing *D.A. Schulte, Inc. v. Gangi*, 328 U.S. 108, 113 n.8 (1946)).

[29] *Compare Wolinsky v. Scholastic Inc.*, 900 F. Supp. 2d 332, 335 (S.D.N.Y. 2012) ("[A]n employee may not waive or otherwise settle an FLSA claim for unpaid wages for less than the full statutory damages unless the settlement is supervised by the Secretary of Labor or made pursuant to a judicially supervised stipulated settlement."), *with Picerni v. Bilingual SEIT & Preschool Inc.*, 925 F. Supp. 2d 368, 376, 378-79 (E.D.N.Y. 2013) (concluding that "the FLSA is not exempt from the right of voluntary dismissal under Rule 41" and that parties may settle an FLSA case without court approval, though by doing so they assume the risk of a future court determining that the settlement was unreasonable and will not be enforced). The question hinges on the structure and purpose of the FLSA and has no import beyond the FLSA context.

[30] *See, e.g.*, *Armenta v. Dirty Bird Grp., LLC*, No. 13-cv-4603 (WHP), 2014 WL 3344287, at *4 (S.D.N.Y. June 27, 2014) ("Taken to its logical conclusion, *Picerni* would permit defendants to circumvent the FLSA's 'deterrent effect' and eviscerate FLSA protections."); *Archer v. TNT USA, Inc.*, 12 F. Supp. 3d 373, 384 n.2 (E.D.N.Y. 2014) (discussing courts' reluctance to adopt the holding of *Picerni*).

[31] *Lliguichuzhca v. Cinema 60, LLC*, 948 F. Supp. 2d 362, 365 (S.D.N.Y. 2013) (scrutinizing an FLSA settlement after the parties sought court approval).

8

reasonable" and whether any proposed award of attorneys' fees is reasonable.[32] Such scrutiny is especially important in light of the recent explosion in FLSA litigation. According to one estimate, FLSA filings have increased some 400 percent nationwide since 2001 and now comprise nearly nine percent of all new civil cases in this district.[33] In such circumstances, courts must remain alert to the risk that the filing and settling of FLSA cases has become a volume-based business and that "the interest of plaintiffs' counsel in counsel's own compensation will adversely affect the extent of the relief counsel will procure for the clients."[34]

In determining whether to approve a proposed FLSA settlement, relevant factors include:

> "(1) the plaintiff's range of possible recovery; (2) the extent to which the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses; (3) the seriousness of the litigation risks faced by the parties; (4) whether the settlement agreement is the product of arm's-length bargaining between experienced counsel; and (5) the possibility of fraud or collusion."[35]

Factors that weigh against settlement approval include:

> "(1) the presence of other employees situated similarly to the claimant; (2) a likelihood that the claimant's circumstance will recur; (3) a history of FLSA non-compliance by the same employer or others in the same industry or geographic region; and (4) the desirability of a mature record and a pointed determination of the governing factual or legal issue to further the development of the law either in general

---

[32] *Wolinsky*, 900 F. Supp. 2d at 335-36.

[33] *Fujiwara v. Sushi Yasuda Ltd.*, No. 12-cv-8742 (WHP), 2014 WL 5840700, at *1 (S.D.N.Y. Nov. 12, 2014).

[34] *Cisek v. Nat'l Surface Cleaning, Inc.*, 954 F. Supp. 110, 110-11 (S.D.N.Y. 1997).

[35] *Wolinsky*, 900 F. Supp. 2d at 335 (internal quotation marks omitted).

or in an industry or in a workplace."[36]

Examination of whether a proposed FLSA settlement is fair and reasonable, therefore, is an information intensive undertaking. At a minimum, the Court requires evidence as to the nature of plaintiffs' claims, the *bona fides* of the litigation and negotiation process, the employers' potential exposure both to plaintiffs and to any putative class, the bases of estimates of plaintiffs' maximum possible recovery, the probability of plaintiffs' success on the merits, and evidence supporting any requested fee award.

II. The Court Will Not Approve the Proposed Settlement in Its Current Form

    A. The Parties Have Not Provided the Court with All Necessary Information

The parties have not "provide[d] the Court with each party's estimate of the number of hours worked or the applicable wage."[37] The Court therefore has no sense of how the parties' counsel arrived at the opposing maximum recovery figures of $25,000 and $49,000, nor to what extent resolution of the various factual disputes cited in the parties' submission in either side's favor would alter those figures. The parties' submission lacks also any declarations, affidavits or exhibits substantiating its arguments.[38] In the absence of such information, the Court cannot discharge its duty to ensure that the proposed settlement is fair and reasonable. It may be that the proposed settlement would merit approval in light of a more complete record. As it stands, however, the current

---

[36] *Id*. at 336 (internal quotation marks omitted).

[37] *Mamani v. Licetti*, No. 13-cv-7002 (KMW), 2014 WL 2971050, at *2 (S.D.N.Y. July 2, 2014) (rejecting a proposed FLSA settlement agreement).

[38] *See, e.g.*, *Lizondro-Garcia v. Kefi LLC*, 300 F.R.D. 169, 180 (S.D.N.Y. 2014) (approving an FLSA settlement on the basis of such evidence).

submission is inadequate.

The Agreement fails also to specify the total amount that each of the three named plaintiffs would receive. Section 7 of the Agreement, which delineates the terms of payment, contemplates a two-step process. First, the three named plaintiffs would receive a combined total of $2,000 directly from defendants as wages, subject to taxes and withholding.[39] Second, the Agreement states that defendants would issue a check "payable to 'Michael Faillace & Associates, P.C.' in the amount of $25,500.00 . . . which represents the alleged liquidated damages, interest, penalties, attorneys' fees and costs owed Plaintiffs and their counsel . . . ."[40] According to the letter accompanying the parties' submission, plaintiffs' attorneys then would distribute $14,500 to the named plaintiffs,[41] in addition to the $2,000 to be paid as wages.

Nowhere in the parties' submission is there an actual, bottom-line statement of the dollar amount that each of the named plaintiffs would receive from the proposed settlement. This omission, coupled with the parties' failure to specify on a plaintiff-by-plaintiff basis the alleged numbers of hours worked and applicable wages, leaves the Court in a position in which it cannot discharge its duty to determine whether the settlement amount is fair and reasonable as to each of the named plaintiffs.

Any revised settlement agreement should specify the actual dollar amount of each plaintiff's total recovery. The accompanying submission should explain the calculations and factual

---

[39] Plaintiff Lopez is to receive $700, plaintiff Melo is to receive $150, and plaintiff Ajtun is to receive $1,150. Agreement § 7(A)(i)–(iii).

[40] *Id.* § 7(A)(iv) (emphasis removed).

[41] Androphy Ltr. at 2.

11

bases underlying these recovery amounts.

    B.    *The Confidentiality Provisions Are Incompatible with the Purposes of the FLSA*

Section 8 of the Agreement contains a battery of highly restrictive confidentiality provisions.[42] These provisions are in strong tension with the remedial purposes of the FLSA.

In the first place, the Court previously has held that FLSA settlements may not be confidential and must be posted to the Court's public docket.[43] In this respect, the Court has joined the "overwhelming majority of courts [that] reject the proposition that FLSA settlement agreements can be confidential."[44]

One reason for rejecting the confidentiality of FLSA settlements relates to the right of access to "judicial documents," defined as a documents "relevant to the performance of the judicial function and useful in the judicial process."[45] Once a court determines that the right attaches, it then must "determine the . . . 'weight to be given to the presumption of access'" as measured by "'the role of the material at issue in the exercise of the Article III judicial power and the resultant value of that

---

[42] *See* discussion *supra* at pages 4-6.

[43] *Camacho v. Ess-A-Bagel, Inc.*, No. 14-cv-2592 (LAK), 2014 WL 6985633, at *3 (S.D.N.Y. Dec. 11, 2014) ("*Camacho I*").

[44] *Armenta*, 2014 WL 3344287, at *2; *see also Joo v. Kitchen Table, Inc.*, 763 F. Supp. 2d 643, 648 (S.D.N.Y. 2011) ("[T]his Court joins the overwhelming consensus of district courts that have considered the issue to hold that an FLSA settlement cannot be sealed absent some showing that overcomes the presumption of public access.") (surveying cases).

[45] *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006).

12

information to those monitoring the federal courts.'"[46] "Only when competing interests outweigh the presumption may access be denied."[47]

FLSA settlements "indisputably" implicate the "judicial function" because they require judicial approval.[48] The rationale for rejecting confidential FLSA settlements is "particularly strong," since "[s]ealing FLSA settlements from public scrutiny could thwart the public's independent interest in assuring that employees' wages are fair."[49] The Court has held that FLSA settlements are judicial documents to which the public's right of access attaches,[50] and has concluded further that any countervailing privacy interests often will be outweighed by the public's interest in ensuring that workers receive "[a] fair day's pay for a fair day's work."[51] The Court accordingly will not approve the proposed settlement, at least on the present record, unless any revised Agreement is posted to the public docket.

Second, the Court will not approve any provisions in the Agreement that would bar plaintiffs from openly discussing their experiences litigating this wage-and-hour case. These include Section 8(B) (prohibiting the plaintiffs from discussing their experiences except "pursuant to

---

[46] *Id.* at 119 (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995)).

[47] *United States v. Erie Cnty.*, 763 F.3d 235, 239 (2d Cir. 2014).

[48] *Wolinksy*, 900 F. Supp. 2d at 337.

[49] *Tran v. Thai*, No. 08-cv-3650 (LHR), 2009 WL 2477653, at *1 (S.D. Tex. Aug. 12, 2009) (internal quotation marks omitted).

[50] *Camacho I*, 2014 WL 6985633, at *3.

[51] *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 283 (2d Cir. 2008) (quoting 81 CONG. REC. 4983 (1937) (message of President Roosevelt)).

subpoena or other compulsory legal process"), Section 8(C) (stating that plaintiffs "will not make any negative statement about the Defendants, or otherwise disparage them, nor will they encourage or direct others to do so"), and Section 8(E) (limiting plaintiffs' ability to respond to inquiries about their suit). These provisions, like the confidentiality requirement, run afoul of the purposes of the FLSA and the "public's independent interest in assuring that employees' wages are fair."[52]

The Court's obligation to police FLSA settlements to ensure that they are fair and reasonable is demanding. It implicates both the rights of the settling employee and the interests of the public at large. As one court has concluded:

> "To fully implement the policy embodied by the FLSA, the district should scrutinize the compromise in two steps. First, the court should consider whether the compromise is fair and reasonable to the employee (factors 'internal' to the compromise). If the compromise is reasonable to the employee, the court should inquire whether the compromise otherwise impermissibly frustrates implementation of the FLSA (factors 'external' to the compromise). The court should approve the compromise only if the compromise is reasonable to the employee and furthers implementation of the FLSA in the workplace."[53]

It is in this second sense – that of what the Court has described as "external fairness" – that the confidentiality provisions are problematic.[54] The "purpose underlying the FLSA is the protection of 'the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others,' and to accomplish these ends, the FLSA 'should be broadly

---

[52] *Stalnaker v. Novar Corp.*, 293 F. Supp. 2d 1260, 1264 (M.D. Ala. 2003).

[53] *Dees v. Hydradry, Inc.*, 706 F. Supp. 2d 1227, 1241 (M.D. Fla. 2010).

[54] *Camacho v. Ess-A-Bagel, Inc.*, No. 14-cv-2592 (LAK), 2015 WL 129723, at *2 (S.D.N.Y. Jan. 9, 2015) ("*Camacho II*").

14

interpreted and applied.'"[55]  Barring the plaintiffs from speaking about their experience would "further[] resolution of no *bona fide* dispute between the parties," but rather "thwart[] Congress's intent to ensure widespread compliance with the statute . . . by silencing the employee who has vindicated a disputed FLSA right."[56]

Among the people who require the protection of the FLSA are workers who are poorly educated and non-English speaking.  Some of these workers may have an understandable aversion to courthouses and lawyers.[57]  At the same time, such persons are especially vulnerable to workplace exploitation and have much to gain from the diffusion of information about their employment rights.[58]  A non-disclosure provision blocks such information.

To be sure, electronic docketing has increased the public's access to court documents for persons with the knowledge and internet access to look for them.[59]  Practically speaking, however,

---

[55] *Poulin v. Gen. Dynamics Shared Res., Inc.*, No. 09-cv-58 (NKM), 2010 WL 1257751, at *2 (W.D. Va. Mar. 26, 2010) (quoting *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006)).

[56] *Dees*, 706 F. Supp. 2d at 1242.

[57] *See* Elizabeth Wilkins, *Silent Workers, Disappearing Rights: Confidential Settlements and the Fair Labor Standards Act*, 34 BERKELEY J. EMP. & LAB. L. 109, 138 (2013) (noting that foreign-born workers now comprise over 20 percent of those making poverty wages and that a "quarter of new immigrants are undocumented," rendering such workers "particularly susceptible to intimidation").

[58] *See, e.g.*, *Socias v. Vornado Realty L.P.*, 297 F.R.D. 38, 40 (E.D.N.Y. 2014) ("Low wage employees, even when represented in the context of a pending lawsuit, often face extenuating economic and social circumstances and lack equal bargaining power; therefore, they are more susceptible to coercion or more likely to accept unreasonable, discounted settlement offers quickly.").

[59] *See, e.g.*, Lewis A. Kaplan, *Litigation, Privacy and the Electronic Age*, 4 YALE J.L. & TECH. (*formerly* YALE SYMP. L. & TECH.) 1, 23 (2001).

the public filing of the settlement in this case, standing alone, is unlikely to benefit low-wage workers. Documents available via ECF are almost as obscure for some people, including many whom the FLSA aims to protect, as paper courthouse filings were in the pre-digital age. Pragmatically, the best way for a worker to learn about his or her employment rights is directly or indirectly from a co-worker or an outside organization. Yet non-disclosure provisions prevent workers "from using a win to publicize both the wrongdoing of the employer and the possibility of success more generally."[60] For these reasons, a non-disclosure agreement in an FLSA settlement, even when the settlement papers are publically available on the Court's docket, is "contrary to well-established public policy" because it inhibits one of the FLSA's primary goals – to ensure "that all workers are aware of their rights."[61]

To this contention one might object, as many have, that confidentiality clauses and non-disclosure agreements encourage settlements by insulating defendants from the possibility of copycat litigation. Indeed, that is so in most contexts. But the congressional purposes underlying the FLSA change the calculus in cases like these. The FLSA evinces "Congress's intent . . . both to advance employees' awareness of their FLSA rights and to ensure pervasive implementation of the FLSA in the workplace."[62] "[F]ear of copycat lawsuits or embarrassing inquiries" does not "suffice to defeat" these objectives.[63] Thus, while "an employee whose rights have been vindicated through

---

[60] Wilkins, *Silent Workers*, 34 BERKELEY J. EMP. & LAB. L. at 143.

[61] *Guareno v. Vincent Perito, Inc.*, No. 14-cv-1635 (WHP), 2014 WL 4953746, at *1 (S.D.N.Y. Sept. 26, 2014).

[62] *Dees*, 706 F. Supp. 2d at 1245.

[63] *Wolinsky*, 900 F. Supp. 2d at 338 (rejecting a request to seal an FLSA settlement).

the FLSA may inform and encourage other employees to do the same, 'vindication of FLSA rights throughout the workplace is precisely the object Congress chose to preserve and foster through the FLSA.'"[64] It is difficult to imagine a scenario in which the parties' interest in non-disclosure trumps these congressional purposes.[65]

The liquidated damages provision places the conflict between the purposes of the FLSA and the confidentiality obligations of the Agreement in especially stark relief.  As one court has explained, "[i]f an employee covered by a confidentiality agreement discusses the FLSA with fellow employees," the employer's "most proximate damages" are quite likely "the unpaid FLSA wages due other employees who learned of their FLSA rights from the employee who breached the confidentiality agreement."[66]  In this scenario, a liquidated damages provision would "transfer[] to the wronged employee a duty to pay his fellow employees for the FLSA wages unlawfully withheld by the employer" – an "unseemly prospect [that] vividly displays the inherent impropriety of a confidentiality agreement in settlement of an FLSA dispute."[67]  To be sure, the liquidated penalty in the Agreement, $3,000, is unlikely to represent a large portion of other employees' pay, although it

---

[64] *Bouzzi v. F & J Pine Rest., LLC*, 841 F. Supp. 2d 635, 642 (E.D.N.Y. 2012) (quoting *Hens v. ClientLogic Operating Corp.*, No. 05-cv-381S (WMS), 2010 WL 4340919, at *4 (W.D.N.Y. Nov. 2, 2010)).

[65] It is important to note that not *every* non-disparagement clause in an FLSA settlement is *per se* objectionable.  As consideration for a settlement payment, plaintiffs may contract away their right to say things that are insulting or calumnious about the defendants.  But insofar as Section 8(C) would bar plaintiffs from making "any negative statement" about the defendants, it must include a carve-out for truthful statements about plaintiffs' experience litigating their case.  Otherwise, such a provision contravenes the remedial purposes of the statute and, in this context, is not "fair and reasonable."

[66] *Dees*, 706 F. Supp. 2d at 1242.

[67] *Id.*

17

very well may represent a substantial burden for a plaintiff earning only minimum wage. In any event, such a provision has the insalubrious effect of threatening to penalize an FLSA plaintiff who discusses his or her efforts to enforce statutory rights to fair pay.

The Court accordingly will not approve the proposed settlement, at least on the present record, unless the confidentiality, non-disclosure, and non-disparagement provisions of Section 8, as well as the liquidated damages provision, are removed or narrowly tailored to allow plaintiffs to discuss their litigation of this case.

     C.    *The Language of the Proposed Releases Is Impermissibly Overbroad*

As drafted, the language of the proposed releases is far too sweeping to be "fair and reasonable." They purport to waive practically any possible claim against the defendants, including unknown claims and claims that have no relationship whatsoever to wage-and-hour issues.

Courts typically reject such broad releases. In this circuit, for example, class action releases "may include claims not presented and even those which could not have been presented," but only when "the released conduct arises out of the identical factual predicate as the settled conduct."[68] The releases in the proposed Agreement contain no such limitation.

In the context of an FLSA case in which the Court has an obligation to police unequal bargaining power between employees and employers, such broad releases are doubly problematic. As one court has concluded:

---

[68] *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 107 (2d Cir. 2005) (internal quotation marks omitted).

18

"An employee who executes a broad release effectively gambles, exchanging unknown rights for a few hundred or a few thousand dollars to which he is otherwise unconditionally entitled. In effect, the employer requests a pervasive release in order to transfer to the employee the risk of extinguishing an unknown claim. . . . Although inconsequential in the typical civil case (for which settlement requires no judicial review), an employer is not entitled to use an FLSA claim . . . to leverage a release from liability unconnected to the FLSA."[69]

This Court agrees, and indeed has rejected identical FLSA releases elsewhere.[70] The parties have every right to enter into a settlement that waives claims relating to the existing suit in exchange for a settlement payment. But the Court will not countenance employers using FLSA settlements to erase all liability whatsoever in exchange for partial payment of wages allegedly required by statute. A release as broad as that in the proposed Agreement "confers an uncompensated, unevaluated, and unfair benefit on the employer" and is "inequitable and unfair."[71]

These deficiencies must be remedied before approval is appropriate.

III.     *The Application for Attorneys' Fees Is Inadequate*

Courts in FLSA cases consider whether a proposed award of attorneys' fees is reasonable.[72] In this circuit, a proper fee request "entails submitting contemporaneous billing records documenting, for each attorney, the date, the hours expended, and the nature of the work done."[73]

---

[69] *Moreno v. Regions Bank*, 729 F. Supp. 2d 1346, 1351 (M.D. Fla. 2010).

[70] *Camacho I*, 2014 WL 6985633, at *4.

[71] *Moreno*, 729 F. Supp. 2d at 1352.

[72] *Wolinsky*, 900 F. Supp. 2d at 336-37.

[73] *Id.* at 336 (citing *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983)).

19

The present submission includes none of this information. Especially problematic is the fact that counsel's submission touts the fact that the proposed fee award is "a compromise from Plaintiff's lodestar in this case of $12,350," while providing no information about how that lodestar was calculated.[74] Courts deny unsubstantiated FLSA fee requests[75] and will decrease a requested fee if the hours billed are unreasonable or the hourly rate too high.[76]

It may be that counsel's fee request is entirely commensurate with the amount of time that the lawyers spent on this case. But such determinations require evidence, and plaintiff's counsel has provided none. The fee request therefore cannot be approved.

*Conclusion*

The request to approve the proposed settlement is denied without prejudice to the filing of a new and complete motion for approval.

SO ORDERED.

Dated:  March 30, 2015

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[74] Androphy Ltr. at 3.

[75] *See, e.g.*, *Mamani*, 2014 WL 2971050, at *3 (rejecting a fee request in the absence of substantiating evidence).

[76] *See, e.g.*, *Aguilera v. Cookie Panache*, No. 13-cv-6071 (KBF), 2014 WL 2115143, at *2-4 (S.D.N.Y. May 20, 2014).